UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACEQUIA, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 5:16-cv-00769 |
| v. | § | |
| | § | (JURY TRIAL DEMANDED) |
| VYSK COMMUNICATIONS, INC. and | § | |
| VICTOR COCCHIA, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S COMPLAINT**

Plaintiff, Acequia, LLC ("Plaintiff" or "Acequia"), files this complaint against Defendants Vysk Communications, Inc. ("Vysk" or "the Company") and Victor Cocchia, ("Cocchia" or jointly with Vysk, "Defendants"), and respectfully states as follows:

**INTRODUCTION**

1.     Acequia purchased a series of convertible notes from Vysk, a technology startup company based in San Antonio, between October and December 2015 (the "Notes"). In the weeks leading up to Acequia's purchase, Vysk and its chief executive officer, Cocchia, provided Acequia with information that portrayed the Company as well on its way to capturing a relatively untapped market:  turning ordinary mobile phones into highly secure communication devices that could be used worldwide by government agencies and individuals alike. Vysk represented that it had secured distribution agreements with companies in Asia, Latin America, and Eastern Europe, which, in turn, had generated over $7 million in revenues and $1.6 million in profit in the first six months of 2015. And according to Cocchia's projections, those agreements would generate another $20 million in revenues and $4 million in net profit in 2015 and over $200 million in revenues and $43.9 million in net profit in 2016.

2.      Those revenues and profits, along with Cocchia's grandiose projections, unfortunately turned out to be nothing more than figments of Cocchia's imagination. In reality, Vysk lost more than $6.5 million in 2015 and another $438,399 in January 2016—a fact Acequia only learned after it threatened to declare an event of default under the Notes for Vysk's and Cocchia's inexplicable refusal to comply with its most basic contractual obligations. Vysk, for instance, has failed to provide (and still has not provided) timely financial statements. And what limited financial information Vysk finally did provide after being pressed for months revealed a far different and underperforming company than the one Cocchia portrayed in October 2015. Rather than a juggernaut poised for success, Vysk is a sinking ship with a rogue chief executive officer at its helm who has burned through nearly $15 million in innocent investor funds by making poor and reckless business decisions.

3.      Even worse, Acequia later discovered that Cocchia had repeatedly misrepresented and concealed critical information about Vysk in a desperate bid to secure funding from Acequia. For example, despite representing that Vysk had "paid all federal, state and other material taxes, assessments, fees and other governmental charges" in the parties' contract, Cocchia eventually admitted that Vysk owed over $1.2 million in federal payroll taxes, a shocking revelation for a three-year old startup. Similarly, in numerous emails and in the parties' contract, Vysk represented that it owned all of the intellectual property and patents associated with its product, which Vysk's chief financial officer claimed were "critical to protecting Vysk's proprietary technology." That representation too was false, as Cocchia had in fact executed a licensing agreement for four of those patents in which the licensor "retain[ed] ownership" and which would become non-exclusive if Vysk failed to achieve certain revenue milestones. And due to Vysk's abysmal performance under Cocchia's leadership, it has no realistic opportunity to meet those milestones.

4.      Cocchia's serial misrepresentations of fact and unprofessional disregard for Vysk's contractual obligations left Acequia with no option but to accelerate the Notes and seek repayment. Of course, because Vysk has not generated any real revenue and has no realistic prospect of generating any profits in the near future, it has failed to pay Acequia. Vysk also has refused to provide Acequia with the collateral that secured its payment obligations under the Notes. In this action, Acequia seeks to recover the principal and interest it is owed due to Vysk's contractual breaches, fraud, and violations of state and federal securities laws. Acequia also seeks to hold Cocchia, a control person as defined by both the Securities Exchange Act of 1934 and Texas Securities Act, jointly and severally liable for Vysk's material misrepresentations and omissions.

## PARTIES

5.      Plaintiff Acequia, LLC is a Texas limited liability company with its principal place of business in San Antonio, Bexar County, Texas.

6.      Defendant Vysk Communications, Inc. is a Delaware corporation with its principal place of business in San Antonio, Bexar County, Texas. Vysk Communications, Inc. can be served with process through its registered agent, Victor Cocchia, at 300 Convent St., Suite 1330, San Antonio, Texas 78205 or at 200 E. Basse Road, Suite 201, San Antonio, Texas 78209. Vysk may also be served through its registered agent in Delaware, The Corporation Trust Company, at 1209 Orange St., Wilmington, Delaware 19601.

7.      Defendant Victor Cocchia is a resident of San Antonio, Bexar County, Texas, and can be served with process at 228 W. Mulberry Ave., San Antonio, Texas 78212 or at 200 E. Basse Road, Suite 201, San Antonio, Texas 78209.

## JURISDICTION AND VENUE

8.      This action involves claims that arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder

(17 C.F.R. §240.10b-5). Accordingly, the Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331. The Court has supplemental jurisdiction over Plaintiff's other claims under 28 U.S.C. §1367.

9.      Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. § 1391(b)(1) because all parties are residents of Texas and the Defendants reside in this district. Moreover, the parties consented to personal jurisdiction and venue in the "federal and state courts located in Bexar County, Texas" in the Note Purchase Agreement (as defined below).

## FACTUAL BACKROUND

10.      Vysk is a technology startup company. Founded in 2013 by Cocchia and Dr. Michael Fiske ("Fiske"), Vysk touts itself as having developed the "world's most secure form of mobile communication." Vysk's product combines a smartphone case—which includes manual camera shutters and a microphone jammer—with mobile phone applications that allow its users to make encrypted phone calls and send secure text messages, among other things. According to its marketing materials, Vysk claims that it "holds more than a dozen patents related to privacy, security and encryption" related to its products.

*Vysk Seeks an Investment From Acequia*

11.      In mid-2015, after spending nearly $12 million in investor funds, Vysk was actively courting new investors to help continue funding its product development and manufacturing operations. Peter Selig ("Selig"), Acequia's manager, was connected with David Rocha ("Rocha"), Vysk's vice president of sales, through a mutual friend. Selig is a seasoned tech and angel investor, and was asked to meet with Vysk's executive team to provide feedback and consider a potential investment.

12.      Selig met with Cocchia, Rocha, and Roy Johnston ("Johnston"), the Company's chief financial officer, on July 29, 2015. At the meeting, Vysk's executive team introduced Selig

to its product, discussed Vysk's historic financial performance and growth projections, and described their prior and current capital raising efforts. Up to that point, Vysk had raised approximately $12 million through common stock offerings at varying and increasing enterprise values of up to $100 million. Vysk's executive team also told Selig that they were in the process of raising an additional $10 to $15 million through a common stock offering and agreed to provide Selig with a more detailed offering package.

13.     The next day, July 30, 2015, both Rocha and Johnston followed up by email with Selig to discuss next steps and provide initial due diligence materials for Selig to consider. In those emails, Johnston reiterated that Vysk was "offering shares at $5.52 per share," effectively placing a $131 million valuation on the Company, and expected to close a $10-15 million round of investments by the end of August. Johnston also relayed that Vysk would be willing to discount the price per share by up to 20% if Selig and his investors were able to close before then. In later emails, Rocha likewise claimed that Vysk Communications had "large investors coming in over the next few weeks" and would very soon be raising capital from candidates in Mexico City, London, and San Diego. Rocha also repeatedly stressed in these emails that they should reach a deal quickly because "it is a fluid situation," "timing is important," and if Selig waited too long, "the parameters could be different."

14.     Over the next few weeks, Vysk continued to communicate with and provide due diligence materials to Selig by phone and email. For example, in response to Selig's request for due diligence materials on July 30, 2015, Johnston immediately provided Selig with a list of Vysk's "current patents," which Johnston described "as critical to protecting Vysk's proprietary technology." Johnston copied both Cocchia and Rocha on that email. (Vysk later provided Selig

with a marketing presentation dated August 7, 2015 (the "Pitch Book"), that listed the same patents as "Vysk Patents/Patents Pending.")

15.     Vysk also provided Selig with financial information about the Company, which purported to show a company with a solid financial foundation. Johnston first emailed Vysk's financial statements, projections, and capitalization table to Selig and John Mosher ("Mosher"), who often co-invests with Selig, on August 6, 2015. Those financial statements showed that Vysk had over $7 million in revenues through June 30, 2015, and approximately $1.6 million in net income. Vysk's balance sheet also showed significant accounts receivable totaling over $7 million, with accounts payable totaling $4.6 million. In response to a direct question from Mosher, Rocha explained in an email that Vysk's "accounts payable [were] made up largely of costs to produce for the retail product in Asia. There are still items pertaining to marketing, production, inventory, operations and such located in there, but they make up about 40% of the total A/P."

16.     The projections, which Cocchia prepared, showed Vysk's revenues growing to $27.6 million by the end of 2015, of which $16.8 million would be generated in the fourth quarter alone. The projections also showed Vysk's net profits growing from $4.6 million in 2015 to almost $43 million in 2016, supported by nearly $200 million in revenues.

***Vysk and Selig Negotiate the Terms of an Investment***

17.     After reviewing the financial information and sales projections that Vysk provided, Selig expressed an interest in investing in Vysk. Because Vysk was seeking capital on an accelerated timeline, Selig proposed a staged investment. Specifically, in an August 8, 2015 email, Selig proposed a smaller initial investment in the form of preferred stock to assist Vysk with its immediate cash needs, followed by a more substantial investment if the Company performed as projected and after Selig and his investors were able to conduct more extensive due diligence.

18.     Over the next two weeks, Selig and Vysk's executives discussed—by email, phone, and at in-person meetings—various ways to structure the investment. Because the Company did not have any debt, Cocchia expressed an interest in using convertible notes as a vehicle for Selig's investment. Convertible notes are a form of debt that can be converted into equity at a later date, typically in connection with future equity raises, and are a common way for seed investors to invest in startups. Based on those discussions, Selig promptly emailed a draft term sheet to Cocchia, Rocha, and Johnston on August 22, 2015, which proposed an initial investment of $1.5 to $2.5 million in the form of convertible notes, followed by an equity infusion of up to $12 million at a later date based on Vysk's performance. In addition to the ability to convert the notes into Vysk common stock, the draft term sheet included an "equity incentive" in the form of warrants to purchase Vysk common stock. The warrants served as a "sweetener," or additional consideration that reflected the heightened risk associated with investing in a startup company.

19.     At the same time the parties were negotiating the terms of an investment, Vysk provided Selig with updated financial projections and other due diligence materials. For example, on August 18, 2015, Rocha forwarded sales and cash flow projections prepared by Cocchia, which projected over $30 million in sales between September 2015 and February 2016. Rocha also emailed Vysk's customer list to Selig on August 18, 2015. That list claimed that Vysk had executed distribution agreements with three customers: (a) America Movil/Hitts, a leading wireless services provider in Latin America; (b) Alternative Group, a distributor in the Commonwealth of Independent States; and (c) SKT/Ji-In, a large distributor in Asia. Cocchia explained in an email later that day that SKT/Ji-In—which was required to purchase 30,000 units per quarter according to the customer list Rocha provided earlier that day— accounted for the vast majority of the sales

in the updated projections. Rocha's list also indicated that Vysk expected to sell 100,000 units per year to both America Movil/Hitts and Alternative Group.

20.     Selig and Cocchia executed a term sheet on September 3, 2015 (the "Term Sheet") outlining the terms of an investment in Vysk by Selig and his group. As in the draft term sheet, the Term Sheet contemplated an initial investment of $1.5 to $2.5 million in the form of convertible notes bearing 8% interest with a three-year term, which were convertible into Vysk common or preferred stock and secured by certain of Vysk's assets. The Term Sheet, like the draft term sheet, also included an "equity incentive" in the form of warrants to purchase Vysk common stock and the right to participate in future securities offerings by the Company.

21.     Moreover, the Term Sheet included a number of other essential terms that would eventually be incorporated into the parties' agreement and were designed to protect both Selig's investment and the Company. For example, under the transaction contemplated in the Term Sheet, Vysk would be required to provide monthly, unaudited financial statements "within 30 days of month end" and annual audited financial statements "within 120 days of year end." Periodic financial statements would allow Selig to monitor the Company's performance, as well as ensure that Vysk kept track of its own performance in real time. Likewise, because protecting Vysk's technology was important to Vysk's long term success, the Term Sheet included a provision that would require it to enter into "Proprietary Information Agreements" with key employees that contained "provisions reasonably satisfactory to Lender with respect to . . . corporate ownership of inventions and innovations during employment." Finally, because chief executive officers are often crucial to a startup's success, the Term Sheet contemplated that Vysk would "purchase and maintain" a $2.5 million key-man life insurance policy on Cocchia.

*Vysk Sells Senior Convertible Notes to Acequia*

22.     On October 8, 2015, Vysk and Acequia, the investment vehicle set up by Selig, executed a standard note purchase agreement (the "Note Purchase Agreement"). Under the Note Purchase Agreement, Vysk agreed "to issue and sell to each of the Investors . . . a senior secured convertible promissory note in the form of Exhibit A . . . in an aggregate principal amount not to exceed $2,500,000." As contemplated by the Term Sheet, the Note Purchase Agreement also provided that "in connection with the purchase of the Notes by the Investors, the Company shall issue to each such Investor a stock purchase warrant in the form of Exhibit B." Selig executed the Note Purchase Agreement on behalf of Acequia, which was identified as an "Investor" on Schedule I to the Note Purchase Agreement, and Cocchia executed the agreement on behalf of Vysk.

23.     The proceeds from the Notes were to be used for "general corporate purposes in accordance with the budget and cash flow statements of the Company," which were attached as an exhibit to the Note Purchase Agreement. While more conservative than the projections Johnston provided in July, the budget that Cocchia provided for the Note Purchase Agreement still projected that Vysk would generate over $68 million in revenues in 2016.

24.     Vysk made a number of important representations and warranties in the Note Purchase Agreement. For example, Vysk represented and warranted that the unaudited balance sheet and statement of operations it had provided to Selig for the periods ending June 30, July 31, and August 31, 2015 (the "Financial Statements") "present fairly the financial condition and operating results of the Company"; that there had not "been any damage, destruction, loss or event to the Company" since the date of the Financial Statements "that could reasonably be expected to have a Material Adverse Effect"; and that it had "paid all federal, state and other material taxes,

assessments, fees and other governmental charges." Vysk also represented that "[n]one of the Company's assets or properties is subject to any Liens."

25.     The Financial Statements were substantially similar to those Johnston emailed to Selig in August. For example, the Financial Statements continued to show over $7 million in revenues and over $1.1 million in net income through July 31, 2015. The Financial Statements also continued to show accounts receivable totaling over $7 million, and accounts payable totaling over $4.6 million. Notably, the Financial Statements showed that Vysk had paid over $150,000 in payroll taxes during the first seven months of the year.

26.     With respect to its intellectual property, Vysk represented that Schedule 2(i) to the Note Purchase Agreement "set forth a complete list of the Company's patents, trademarks, registered copyrights and domain names and pending patent, trademark and copyright applications." Moreover, Vysk represented that there was "no outstanding option, license, agreement, claim, encumbrance, or shared ownership interest of any kind relating to" its intellectual property, and that it was not "bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person."

27.     And as contemplated in the Term Sheet, the Note Purchase Agreement imposed a number of important obligations on Vysk. The Note Purchase Agreement, for example, required Vysk to provide unaudited monthly financial statements to Acequia "within thirty (30) days after the end of each month" and annual financial statements audited by an accounting firm "within one hundred and twenty (120) days after the end of each fiscal year of the Company." Vysk also agreed to obtain "key man" term life insurance on Cocchia "within thirty (30) days of the date of the Closing" and to "cause each executive and employee . . . to enter into a nondisclosure and proprietary rights assignment agreement."

28.     Acequia purchased three senior secured convertible notes for a total of $1,573,740 pursuant to the terms of the Note Purchase Agreement on October 8, December 2, and December 15, 2015 (the "Notes"), and was issued corresponding warrants with an exercise price of $4.18 per share (the "Warrants"). For all three Notes, Acequia paid the purchase price by wiring funds to Vysk's account at Chase Bank.

29.     The Notes had a three-year term and bore interest at eight percent. Moreover, the Notes were convertible into Vysk common stock at Acequia's option in connection with certain corporate events. For example, Acequia could convert the Notes into Vysk common stock at a discounted price (or elect to be repaid its principal and interest) if, among other things, Vysk engaged in a "Qualified Financing" or "Non-Qualified Financing."[1] And to allow Acequia to exercise its option to convert or be repaid, the Notes required Vysk to provide Acequia with at least ten-days written notice "prior to" such events. Acequia also had the right to convert any outstanding principal and interest due under the Notes into common stock at any time at the "Common Stock Conversion Price"—a formula based on a $100 million enterprise valuation.

30.     Pursuant to the terms of a Security Agreement dated October 8, 2015 (the "Security Agreement"), the Notes were secured by substantially all of Vysk's tangible and intangible assets except for intellectual property owned by Vysk. The Notes were also secured by a Stock Pledge Agreement between Acequia, as collateral agent, and Victory Cyber Enterprises, LLC, a company owned by Cocchia (the "Stock Pledge Agreement"). Under the Stock Pledge Agreement, Victory Cyber Enterprises, LLC pledged shares of Vysk common stock "[a]s security for the obligations of the Company arising under the Notes."

---

[1] The Notes defined a "Qualified Financing" as a "*bona fide* transaction or series of transactions pursuant to which the Company issues and sells shares of its capital stock for aggregate gross proceeds of at least $2,500,000." A "Non-Qualified Financing" was defined as a "*bona fide* transaction or series of transactions in which the Company issues and sells shares of its capital stock for aggregate gross proceeds of less than $2,500,000."

***Vysk Immediately Breaches Its Representations and Warranties Under the Note Purchase Agreement***

31.     Vysk immediately breached its representations under the Note Purchase Agreement. When Acequia filed a UCC-1 statement to perfect its security interest, Acequia discovered an outstanding lien on Vysk's assets. This was directly contrary to Vysk's representation in the Note Purchase Agreement that "[n]one of the Company's assets or properties is subject to any Liens." While Vysk took steps to have the lien removed, Vysk's misrepresentation was the first of many Acequia has since discovered in recent months.

***Vysk Breaches Its Covenants Under the Note Purchase Agreement***

32.     In the ensuing months, Vysk repeatedly and intentionally failed to comply with its most basic covenants under the Note Purchase Agreement. Vysk, for example, has yet to provide timely monthly financial statements to Acequia. Vysk did not provide financial statements for October 2015 until January 27, 2016—nearly *two months* after they were due—and then only after Selig repeatedly asked Cocchia and Johnston for financial statements for October and November 2015. And the October 2015 financial statements Johnston did provide two months late revealed a devastating development: Vysk had written down its revenues and accounts receivable by more than $7 million, allegedly because "it became clear" that Vysk's sales to SKT/Ji-In—the Asian distributor Cocchia claimed made up the bulk of Vysk's projected revenues—"were not going to be realized." And Vysk's net profit for 2015 dropped nearly $6 million, falling from a net income of over $1.1 million to a loss of nearly $5 million.

33.     Not once had Vysk previously expressed any doubts about its ability to collect its claimed $7 million in accounts receivable. In fact, when Selig questioned Cocchia about Vysk's accounts receivable just prior to closing, Cocchia told Selig that SKT/Ji-In accounted for a significant portion of those receivables and that he was "confident" Vysk would collect on those

receivables "soon." Cocchia also assured Selig that even in the remote chance that something was to happen, SKT would go it alone and Vysk would still collect the $7 million. Vysk repeated the same story—claiming that they "expect[ed] to sign a contract [with SKT] early in 2016"—after finally revealing that its agreement with SKT/Ji-In was ephemeral in a desperate bid to assuage the obvious concerns that such a development would raise. But just like the first agreement with SKT/Ji-In and every other promise Cocchia made, no contract with SKT ever materialized.

34.    By March 2016, Vysk still had not provided monthly financial statements for November 2015, much less December 2015 or January 2016. Vysk also had yet to secure a key-man insurance policy on Cocchia, which it was obligated to obtain by November 8, 2015; provide its budget and marketing plan for 2016, which it was required to provide by January 30, 2016; provide an executed copy of a non-compete and non-solicit agreement by Cocchia, which was a condition precedent to closing under the Note Purchase Agreement; or provide any evidence that it had complied with its obligation to secure nondisclosure and proprietary rights assignment agreements with "each executive and employee." Given Vysk's willful and continued failure to satisfy its covenants under the Note Purchase Agreement, Acequia provided Vysk with written notice—as required to trigger an Event of Default under the Notes—on March 11, 2016. Acequia also requested assurances that Vysk had engaged an auditor and would comply with its obligation to provide audited, annual financial statements by May 1, 2016.

35.    Vysk provided unaudited, annual financial statements for 2015 on March 23, 2016, and financial statements for November 2015 through January 2016 on April 14, 2016. In his April 14 letter, however, Cocchia admitted that Vysk had not obtained a key-man insurance policy, despite its obligation to do so over four months earlier. Vysk's failure to do so within the 30-day cure period constituted an Event of Default under the Notes. Moreover, Vysk stated that it would

not provide timely financial statements for February 2016, and that its audit was "scheduled to begin April 25, 2016," making it virtually impossible for Vysk to provide its annual financial statements "within one hundred and twenty (120) days after the end of each fiscal year of the Company."

***Vysk's Belated Financial Statements Reveal Further Breaches and False Representations***

36.     While Vysk's continued failure to comply with its covenants was troubling, the information revealed in the year-end financial statements Cocchia did provide proved even more troubling. First, the financial statements Cocchia provided revealed for the first time that it had failed to pay over $1.2 million in payroll taxes during 2015. As a result, Vysk's representation that it had "paid all federal, state and other material taxes, assessments, fees and other governmental charges" in the Note Purchase Agreement was false. So too were Vysk's representations that the Financial Statements "present fairly the financial condition and operating results of the Company" and that it had "no liability or obligation" that had not been reflected in the Financial Statements. Vysk's misrepresentations constituted immediate Events of Default under the Notes.

37.     When Selig confronted Cocchia about these blatant misrepresentations, he claimed that the unpaid taxes were reflected in the Financial Statements as part of Vysk's "accounts payable." Aside from the fact that payroll taxes are not considered an account payable, but instead an accrued expense, Rocha had offered a drastically different explanation when directly asked about Vysk's accounts payable in August. Rocha's August 8, 2015 email made no mention of unpaid taxes, instead explaining that Vysk's "accounts payable [were] made up largely of costs to produce for the retail product in Asia" and that "there are still items pertaining to marketing, production, inventory, operations and such located in there, but they make up about 40% of the total A/P." If Cocchia's explanation was accurate, Rocha's statements in August were also false and materially misleading.

38.     Second, the financial statements Cocchia provided confirmed that Vysk had falsified its revenues and net income when soliciting Selig's investment. Rather than the over $7 million in revenues and over $1.1 million in net income shown in the Financial Statements that Vysk warranted "present fairly the financial condition and operating results of the Company," Vysk's unaudited annual financial statements for 2015 shockingly showed total sales of just $266,651 and losses of nearly $6.5 million. Missing were nearly $6 million in sales and $1 million in licensing revenue that Vysk had represented it had earned as of June 30, 2015, and which were attributable to Vysk's supposed distribution agreement with SKT/Ji-In.

39.     On information and belief, Vysk never had an executed distribution agreement with SKT/Ji-In. According to the materials that Rocha provided, Vysk was due an "upfront fee" of $1 million in connection with the execution of the SKT/Ji-In contract. But Vysk never received that fee and never made a single sale under the terms of that agreement. And Vysk has yet to take any legal action to enforce an agreement that accounted for all but a *de minimis* amount of its sales in 2015 and a significant part of its projected sales in 2016. Combined with Vysk's explanation for the loss of such a crucial customer—that it "became clear that these sales were not going to be realized" and that "they weren't able to follow through"—it becomes apparent that Vysk misrepresented the nature of its agreement (if it ever had one) to inflate its revenues.

40.     Third, the financial statements revealed that Cocchia had engaged in a reckless spending spree after selling the Notes to Acequia. Vysk spent over $645,000 on advertising and nearly $400,000 on travel between June and December 2015 (more than twice the amount Vysk spent on both categories in the first half of 2015). In fact, Vysk spent $126,299 on "Travel" in October 2015 alone—twice as much as it spent in September 2015 and three times as much as it had spent in any prior month. Vysk's spending on "Meals and Entertainment" also shot up by

almost $70,000 in the second half of 2015. And Vysk paid $28,049 in "Employee Benefits" in October, which was *more than three times* what it had paid in the preceding nine months *combined*. Acequia found the increased spending in such categories—with what could only be presumed to be the proceeds from Acequia's purchase of the Notes given Vysk's negative revenue over the same period—particularly disturbing given Vysk's disclosure of a $1.2 million tax liability.

41.     Finally, the belated financial statements that Cocchia provided showed that Vysk had engaged in a Non-Qualified Financing in November and December. In total, Vysk raised approximately $850,000 through the sale of common stock without providing any notice—much less 10-days prior written notice—to Acequia as required in the Notes. To date, and despite Acequia's repeated requests, Vysk has refused to provide any documentation about its sale of common stock.

### *Acequia Declares the Notes Due and Payable Based on Multiple Events of Default*

42.     After months of repeated requests that Vysk comply with its contractual obligations, Acequia declared the Notes due and payable on April 20, 2016, due to Vysk's misrepresentations and its failure to cure ongoing covenant violations. Acequia also provided Vysk with notice of additional covenant violations, including the failure to provide financial statements for February, proprietary rights assignment agreements for all of its executives and employees, and notice of a Non-Qualified Financing. Despite Vysk's blatant and total disregard for its contractual duties, Acequia made every effort to work with the Company over the next three months to reach a mutually beneficial resolution. Acequia met with Vysk's executives to discuss its concerns and, when the Company requested additional time to repay the Notes, worked in good faith with the Company for several months to negotiate a forbearance agreement.

43.     Cocchia, however, repeatedly delayed the process and refused to provide Acequia with critical information about Vysk's finances and operations. What little information Cocchia did provide only revealed further misrepresentations by Vysk.  In the Note Purchase Agreement, Vysk represented that "there is ___no___ outstanding option, license, agreement, claim encumbrance or shared ownership of any kind relating to Company Intellectual Property, ___nor___ is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person." Vysk also represented that Schedule 2(i) to the Note Purchase Agreement "set[s] forth a complete list of the ___Company's___ patents, trademarks, registered copyrights and domain names," which included Patent Nos. (i) 7,215,769; (ii) 7,657,033; (iii) 7,886,155; and (iv) 7,701,911.

44.     Cocchia knew that those representations were false. Instead, as Acequia learned, Vysk "is bound by" and "a party to" a license agreement, which Cocchia executed on Vysk's behalf, with Fiske Software LLC. And that licensing agreement specifically provides that Fiske Software LLC—not Vysk—"retains ownership of all Intellectual Property Rights in and to" the four patents identified above. To make matters worse, the exclusivity of that license is subject to specific royalty milestones that Vysk has yet to achieve, placing its "exclusive" license to patents Johnston described as "as critical to protecting Vysk's proprietary technology" at risk.[2] In short, Vysk did not and does not own the foregoing intellectual property and, as a result, its representations and warranties in the Note Purchase Agreement were patently false, as were Johnston's statements in his July 30, 2015 email and Vysk's claims in the Pitch Book.

---

[2] Moreover, Acequia has learned from others at Vysk that its products use additional patents and intellectual property not owned by Vysk.

*Acequia Forecloses Under the Security Agreement and Stock Pledge Agreement*

45.     Ultimately, Cocchia's obfuscation and refusal to repay Acequia or move forward with a forbearance agreement left Acequia with no choice but to foreclose on its collateral. On June 20, 2016, Acequia provided Vysk with notice that it was foreclosing on all pledged collateral under the Security Agreement. Although the Security Agreement requires Vysk to "assemble the Collateral and make it available to" Acequia, Vysk has failed to do so.

46.     Acequia also notified Victory Cyber Enterprises, LLC that it was foreclosing on the collateral pledged under the Stock Pledge Agreement. The Stock Pledge Agreement, like the Warrants, were based on a $4.18 per share price for Vysk common stock. Vysk's common stock, however, is worth far less than $4.18 per share, much less the principal and interest due under the Notes. Vysk lost $6.5 million in 2015, according to the financial statements it finally provided in March, and an additional $438,399 in January 2016. Moreover, Vysk lost its purported distribution agreement with a significant distributor. As a result, Acequia does not expect to find a purchaser that will pay more than a nominal amount for the shares it foreclosed on under the Stock Pledge Agreement.

## CAUSES OF ACTION

### COUNT 1: BREACH OF CONTRACT
### (AGAINST VYSK COMMUNICATIONS)

47.     Plaintiff repeats and re-alleges the allegations set forth in all the preceding paragraphs of the Complaint as if fully set forth herein.

48.     Acequia and Vysk Communications entered into a series of valid and binding contracts, including the Note Purchase Agreement, the Security Agreement, the Stock Pledge Agreement, the Warrants, and the Notes. Acequia performed its obligations under the foregoing contracts by, among other things, paying $1,573,740 for the Notes by wire transfer.

49.     Vysk breached the Note Purchase Agreement by making false representations and warranties, including that: (a) the Financial Statements "fairly presented the financial condition and operating results of the Company"; (b) Vysk had "no liability or obligation" that had not been accounted for in the Financial Statements; (c) Vysk had "paid all federal, state and other material taxes, assessments, fees and other governmental charges" as of October 8, 2015; (d) "there [was] no outstanding option, license, agreement, claim, encumbrance, or shared ownership interest of any kind relating to" Vysk's intellectual property, and that it was not "bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person"; (e) Schedule 2(i) to the Note Purchase Agreement "set forth a complete list of the Company's patents, trademarks, registered copyrights and domain names and pending patent, trademark and copyright applications"; and (f) "[n]one of the Company's assets or properties is subject to any Liens." Each of the foregoing breaches constituted an incurable Event of Default under the Notes.

50.     Vysk also breached the Note Purchase Agreement by failing to satisfy its covenants thereunder, including: (a) providing monthly unaudited financial statements within 30 days after the end of each month; (b) providing audited consolidated balance sheets, statements of income, and cash flows, within 120 days of the end of the 2015 fiscal year; (c) obtaining a $2.5 million insurance policy on Cocchia within 30 days of the date of closing of the Note Purchase Agreement; and (d) causing each executive and employee to "enter into nondisclosure and proprietary rights assignment agreements."

51.     Acequia provided Vysk with written notice of its covenant breaches on January 27, March 11, April 20, and June 24, 2016, as required under the Notes. Because Vysk failed to cure one or more breaches within 30 days of receiving such notice, Vysk's breaches of the Note

Purchase Agreement constitute Events of Default under the Notes. On April 20, 2015, Acequia notified Vysk in writing that it was declaring "all outstanding Obligations payable by the Company [under the Notes] to be immediately due and payable," pursuant to section 3 of the Notes, and that the Notes were accruing interest at the Default Interest Rate specified in the Notes.

52.     Vysk also failed to provide 10-days prior written notice of a Non-Qualified Financing in November and December 2015, as required under the Notes. Acequia provided written notice of Vysk's breach on April 20, 2016, and notified Vysk that it elected to be repaid the outstanding principal amount of the Notes and the Accelerated Interest Amount.

53.     Vysk has failed to pay Acequia the Notes and Accelerated Interest Amount, as required under section 4, and all outstanding Obligations as required under section 3, of the Notes. Vysk has also failed to honor its obligation under the Security Agreement to "assemble the Collateral and make it available to" Acequia.

54.     As a result of Vysk's breaches, Acequia is entitled to recover the outstanding principal of the Notes together with all accrued interest and default interest, in an amount to be proven at trial. In addition, Acequia is entitled to recover all reasonable and necessary attorney's fees under TEX. CIV. PRACT. & REM. CODE § 38.001 for its breach of contract claim. Plaintiff retained counsel, who presented Plaintiff's claim to Vysk. Vysk did not tender the amount owed within 30 days after the claim was presented.

### COUNT 2: SECURITIES FRAUD UNDER THE SECURITIES EXCHANGE ACT OF 1934
### (15 U.S.C. § 78j(b) AND 17 C.F.R. § 240.10b-5)
### (AGAINST VYSK COMMUNICATIONS)

55.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1–46 of the Complaint as if fully set forth herein.

56.     The Notes are securities under the Securities Exchange Act of 1934. In connection with the acts, conduct and other wrongs alleged below, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, electronic mail, and telephone communications.

57.     Vysk, through means and instrumentalities of interstate commerce, made multiple untrue statements of material fact and/or omitted to state material facts necessary to make the statements it made, in light of the circumstances under which they were made, not misleading in connection with Acequia's purchase of the Notes in violation of 15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5. The representations and omissions described below were material because they would have significantly altered the total mix of information available to Acequia, and a reasonable investor would consider such information important in deciding whether to purchase the Notes.

58.     Specifically, Vysk made the following untrue statements of material fact or omissions of material facts prior to the execution of the Note Purchase Agreement:

    a.     Johnston sent an email on July 30, 2015, to Selig (copying Cocchia) in which Johnston stated that he was providing a list of "our current patents," which he described as "as critical to protecting Vysk's proprietary technology." That list included Patent Nos. (i) 7,215,769; (ii) 7,657,033; (iii) 7,886,155; and (iv) 7,701,911. Vysk again represented that it owned the foregoing patents in the Pitch Book on a slide titled "Vysk Patents/Patents Pending." As described above, Vysk does not own those four patents, but instead licenses them from Fiske or one of his companies. Because Cocchia signed the licensing agreement, Cocchia knew that the statements in Johnston's email and the statements in the Pitch Book were false. Cocchia,

however, failed to correct the statements made in Johnston's email or in the Pitch Book.

b.      Johnston emailed Vysk's financial statements to Mosher and Selig on July 30, 2015. Those financial statements were false and misleading because, among other things, Vysk failed to disclose that its accounts payable included a $1.2 million payroll tax liability. Under generally accepted accounting principles, payroll tax liabilities are considered accrued expenses, not accounts payable. As a result, investors would not have realized that Vysk owed more in tax obligations than it had stated as net profit at the time, as Johnston, a Chartered Financial Analyst and twenty-year Wall Street veteran, knew full well. Instead, given Vysk's claim that it had paid over $150,000 in payroll taxes, an investor would expect that Vysk's significant accounts payable represented payments due to manufacturers for products necessary to fulfill orders under its distribution agreements (as Rocha indicated). The financial statements were also false and misleading because, as described above in paragraphs 32–33 and 38–39, they drastically overstated Vysk's revenues and accounts receivable.

c.      In an August 6, 2015 email, Rocha stated that Vysk had "large investors coming in over the next few weeks" in connection with its $10-15 million offering. Those investors did not materialize and have not materialized over the past year. Cocchia, Rocha, and Vysk knew at the time that it did not have commitments from any investors, much less commitments sufficient to close a $10-15 million offering as was represented to Acequia. Instead,

Cocchia used the prospect as a tool of deception to set up a false sense of competition and urgency shorten Acequia's due diligence and close the deal.

d.  In an August 19, 2015 email, Rocha stated that the $4.3 million in accounts payable reflected on Vysk's June 30, 2015 balance sheet were "made up largely of costs to produce for the retail product in Asia." Rocha also claimed that "[t]here are still items pertaining to marketing, production, inventory, operations and such located in there, but they make up about 40% of the total A/P." Rocha's statement was false and materially misleading because, as Cocchia and Johnston later claimed, Vysk's accounts payable included over $1.2 million in unpaid payroll taxes, which were not disclosed to Acequia.

59.  Moreover, Vysk made untrue statements of fact in the Note Purchase Agreement itself, including that (a) the Financial Statements "fairly presented the financial condition and operating results of the Company"; (b) Vysk had "no liability or obligation" that had not been accounted for in the Financial Statements; (c) Vysk had "paid all federal, state and other material taxes, assessments, fees and other governmental charges" as of October 8, 2015; (d) "there [was] no outstanding option, license, agreement, claim, encumbrance, or shared ownership interest of any kind relating to" Vysk's intellectual property, and that it was not "bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person"; (e) Schedule 2(i) to the Note Purchase Agreement "set forth a complete list of the Company's patents, trademarks, registered copyrights and domain names and pending patent, trademark and copyright applications"; and (f) "[n]one of the Company's assets or properties [was]

subject to any Liens" as of October 8, 2015. These representations, which repeated many of the representations that Vysk and its executives made before the execution of the Note Purchase Agreement, were false for all the same reasons identified above.

60.     Vysk made the foregoing untrue statements of fact and omissions with intent to deceive, manipulate, or defraud Acequia. Because Vysk had not generated any material revenue during 2015 (unbeknownst to Acequia), it needed further capital infusions to continue operating its business. And by August 2015, Vysk desperately needed that capital infusion. To secure an investment from Selig, Cocchia and his executive team portrayed Vysk as having significant revenues that were, in reality, non-existent. Cocchia and his executive team also concealed facts that they knew would concern Selig or any seasoned investor, like its outstanding tax obligations and unfavorable licensing agreements for patents "critical to protecting Vysk's proprietary technology." At a minimum, Cocchia and Vysk's other executives acted with severe recklessness in making the foregoing untrue statements or omissions of material fact.

61.     Acequia reasonably relied on the foregoing misstatements and omissions of material fact in purchasing the Notes and has suffered severe losses as a result. The repayment risk associated with the Notes is materially and dramatically different than that originally presented by Vysk. At the time Acequia purchased the Notes, Vysk had over $7 million in outstanding accounts receivable, which was more than sufficient to repay the Notes. In reality, Vysk had only a small fraction of that amount. Accordingly, the Notes are worth far less than their face amount. Moreover, the conversion feature of the Notes, as well as the Warrants, were premised on a $100 million valuation of the Company. That valuation, however, was derived from fraudulent and misleading financial statements and information provided by Cocchia and others at Vysk. Because

Vysk's actual value is significantly lower, the Notes' conversion features and the Warrants are now worthless.

62.     Had Acequia been provided with accurate and true information about Vysk, it would not have purchased the Notes. In this action, Acequia seeks to recover its losses, rescind the transaction, and/or recover rescissory damages, in an amount to be proven at trial.

### COUNT 3: SECURITIES FRAUD UNDER THE TEXAS SECURITIES ACT
### (TEX. REV. CIV. STAT. ART. 581-33A)
### (AGAINST VYSK COMMUNICATIONS)

63.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1–46 of the Complaint as if fully set forth herein.

64.     In the alternative, Vysk is liable for securities fraud under the Texas Securities Act, TEX. REV. CIV. STAT. ART. 581-1, *et seq*.

65.     The Notes are securities under the Texas Securities Act. As described in paragraphs 58–59, Vysk sold the Notes to Acequia by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of TEX. REV. CIV. STAT. ART. 581-33A. Vysk's misrepresentations and omissions were material because they would have significantly affected the investment decisions of a reasonable investor, and a reasonable investor would consider such information important in deciding whether to purchase the Notes.

66.     Vysk therefore is liable for statutory rescission and interest under TEX. REV. CIV. STAT. ART. 581-33D. In addition, Vysk is liable for Acequia's costs and attorney's fees, in an amount to be proven at trial.

**COUNT 4: SECURITIES FRAUD – CONTROL PERSON LIABILITY**
**(15 U.S.C. § 78t(a))**
**(AGAINST VICTOR COCCHIA)**

67.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1–46 and 56–62 of the Complaint as if fully set forth herein.

68.     Vysk, through means and instrumentalities of interstate commerce, made multiple untrue statements of material fact and/or omitted to state material facts necessary to make the statements it made, in light of the circumstances under which they were made, not misleading in connection with Acequia's purchase of the Notes in violation of 15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5.

69.     Cocchia is a control person under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t. Cocchia is Vysk's chief executive officer, chairman of its board, and a significant shareholder through one or more entities under his or his family's control. In fact, entities controlled by Cocchia and his father-in-law are Vysk's two largest shareholders, controlling approximately 28.5% of its voting stock. Moreover, Cocchia's family members, including his wife, father-in-law, and step mother-in-law, sit on Vysk's board of directors. Accordingly, Cocchia possesses the power to direct or cause the direction of the management and policies of Vysk and, in fact, exercised such control over Vysk and his subordinates (Rocha and Johnston) in connection with its sale of the Notes to Acequia.

70.     Moreover, Cocchia induced or otherwise directly participated in each of the misrepresentations made to Acequia. During their negotiations, Selig routinely communicated with Cocchia by email and phone, and often addressed requests for information to Cocchia, who directed Rocha and/or Johnston to respond. In fact, in a number of emails, Rocha and Johnston referred to the fact that they were providing information collected by Cocchia (such as projections)

or discussed answers with Cocchia before sending them to Selig. In the August 19, 2015 email in which Rocha misrepresented the nature of Vysk's accounts payable, for example, Rocha specifically noted that he had worked "with Victor [Cocchia] and Roy [Johnston] on these questions." In other instances, Cocchia directly prepared or participated in preparing materials containing untrue statements of fact, including the Financial Statements and the Pitch Book. Moreover, Cocchia executed the Note Purchase Agreement and directly provided Schedule 2(i) to the Note Purchase Agreement, which purported to list patents owned by Vysk, to Acequia and its attorneys.

71.    Cocchia knew full well that Vysk's statements and representations identified in paragraphs 58–59 were untrue. As the chief executive officer, chairman, and significant shareholder of a small startup company, Cocchia was intimately involved in Vysk's finances and fund raising efforts. Moreover, Cocchia was the principal person responsible for negotiating and securing distribution agreements. As a result, Cocchia knew that the financial statements Vysk provided were materially misleading; that Vysk owed significant payroll taxes; and that Vysk did not have "large investors coming in over the next few weeks" in August 2015. Moreover, as a signatory to the licensing agreements with Fiske and Fiske's companies, Cocchia knew that Vysk's representations concerning its intellectual property ownership were false.

72.    As a result, Cocchia is jointly and severally liable to the same extent as Vysk for its violations of 15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5.

### COUNT 5: SECURITIES FRAUD – CONTROL PERSON LIABILITY
### (TEX. REV. CIV. STAT. ART. 581-33F)
### (AGAINST VICTOR COCCHIA)

73.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1–46 and 62–66 of the Complaint as if fully set forth herein.

74. In the alternative, Cocchia is jointly and severally liable for Vysk's violations of the Texas Securities Act under TEX. REV. CIV. STAT. ART. 581-33F. As described in paragraphs 69–70, Cocchia had actual power or influence over Vysk and induced or participated in its violations of the Texas Securities Act. Moreover, as described in paragraph 70–71, Cocchia directly participated and aided, with intent to deceive or defraud, Vysk in the foregoing violations of TEX. REV. CIV. STAT. ART. 581-33A.

75. Accordingly, Cocchia is jointly and severally liable to the same extent as Vysk for its violations of TEX. REV. CIV. STAT. ART. 581-33A.

## COUNT 6: COMMON LAW FRAUD/FRAUDULENT INDUCEMENT
### (AGAINST VYSK COMMUNICATIONS)

76. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1–46 of the Complaint as if fully set forth herein.

77. As alleged in paragraph 58, Vysk made multiple material misrepresentations of fact, which it knew were false or made recklessly as a positive assertion without any knowledge of their truth.  Moreover, Vysk failed to disclose information when it had a duty to do so, including that it owed over $1.2 million in payroll tax liabilities and did not hold the patents it licensed from Fiske and his companies.

78. Vysk intended to induce Acequia to act upon the misrepresentations. Because Vysk had not generated any material revenue during 2015, it needed further capital infusions to continue operating its business. And by August 2015, Vysk desperately needed that capital infusion. To secure an investment from Selig, Cocchia and his executive team portrayed Vysk as having significant revenues that were, in reality, non-existent. Cocchia and his executive team also concealed facts that they knew would be concerning to Selig, like its outstanding tax obligations

and unfavorable licensing agreements for patents "critical to protecting Vysk's proprietary technology."

79.     Acequia actually and justifiably relied on Vysk's misrepresentations and suffered injury as a result. The repayment risk associated with the Notes is materially different than that originally presented by Vysk. At the time Acequia purchased the Notes, Vysk had over $7 million in outstanding accounts receivable, which was more than sufficient to repay the Notes. In reality, Vysk had only a fraction of that amount. Accordingly, the Notes are worth far less than their face amount. Moreover, the conversion feature of the Notes, as well as the Warrants, were premised on a $100 million valuation of the Company. That valuation, however, was derived from fraudulent and misleading financial statements and information provided by Cocchia and others at Vysk. Because Vysk's actual value is significantly lower, the Notes' conversion features and the Warrants are worthless.

80.     Had Acequia been provided with accurate information about Vysk, it would not have purchased the Notes. In this action, Acequia seeks to rescind the transaction and/or recovery rescissory damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiff demands a jury trial on all contested issues of fact.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff asks for judgment against Defendant, for the following:

a.      actual, compensatory, rescissory, consequential, exemplary, and all other damages in an amount that exceeds the minimum jurisdictional limit of this Court or, in the alternative, rescission of the Notes and Note Purchase Agreement;

b.      judicial foreclosure on all collateral securing Defendant's obligations under the terms of the Security Agreement;

c.      pre-judgment and post-judgment interest at the highest rate allowed by law;

d.      attorney's fees and costs; and

e.      all such other and further relief at law or equity to which Plaintiff may be justly entitled.


Dated: July 28, 2016                     Respectfully submitted,


*/s/ Nathaniel J. Palmer*
Nathaniel J. Palmer
Texas Bar No. 24065864
npalmer@rctlegal.com
Scotty G. Arbuckle, III
Texas Bar No. 24089969
tarbuckle@rctlegal.com
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129

*Counsel for Plaintiff Acequia, LLC*